1  **ROBERT R. HENSSLER, JR.**
   California Bar No. 216165
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, CA 92101-5008
   Telephone: (619) 234-8467
4

5  Attorneys for Mr. Isaac Navarro-Lomeli

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10                  **(HONORABLE L. JAMES LORENZ)**

11  UNITED STATES OF AMERICA,            )    Case No. 08CR0091-L
                                         )
12              Plaintiff,               )
                                         )    STATEMENT OF FACTS AND
13                                       )    MEMORANDUM OF POINTS AND
        v.                               )    AUTHORITIES IN SUPPORT
14                                       )    OF DEFENDANT'S MOTIONS
    ISAAC NAVARRO-LOMELI,                )
15                                       )
              Defendant.                 )
16  _____ )

17                                 **I.**

18                      **STATEMENT OF FACTS**

19          The following statement of facts is based, in part, on materials received from the government.

20  Mr. Navarro-Lomeli does not accept this statement of facts as his own, and reserves the right to take a contrary

21  position at motion hearings and trial.  Mr. Navarro-Lomeli reserves the right to challenge the truth and

22  accuracy of these facts in any subsequent pleadings or during any further proceedings.

23          On November 28, 2007, Customs officers arrested Mr. Navarro-Lomeli at the Calexico west Port

24  of Entry.  They found 46.46 kg of marijuana concealed in the car he was driving.  On January 10, 2008, the

25  Grand Jury indicted Mr. Navarro-Lomeli for violations of 21 U.S.C. §§ 841(a)(1), 952, and 960.  He pled not

26  guilty, and these motions follow.

27  //

28  //

## II.

## MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE

Mr. Navarro-Lomeli moves for the production of the following discovery. This request is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely connected investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir.), cert. denied, 493 U.S. 858 (1989).

(1) The Defendant's Statements. The Government must disclose to the defendant all copies of any written or recorded statements made by the defendant; the substance of any statements made by the defendant which the Government intends to offer in evidence at trial; any response by the defendant to interrogation; the substance of any oral statements which the Government intends to introduce at trial and any written summaries of the defendant's oral statements contained in the handwritten notes of the Government agent; any response to any Miranda warnings which may have been given to the defendant; as well as any other statements by the defendant. Fed. R. Crim. P. 16(a)(1)(A). The Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must reveal all the defendant's statements, whether oral or written, regardless of whether the government intends to make any use of those statements.

(2) Arrest Reports, Notes and Dispatch Tapes. The defendant also specifically requests the Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate to the circumstances surrounding his arrest or any questioning. This request includes, but is not limited to, any rough notes, records, reports, transcripts or other documents in which statements of the defendant or any other discoverable material is contained. Such material is discoverable under Fed. R. Crim. P. 16(a)(1)(A) and Brady v. Maryland, 373 U.S. 83 (1963). The Government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant. See Fed. R. Crim. P. 16(a)(1)(B) and (C), Fed. R. Crim. P. 26.2 and 12(I).

(3) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the Government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

1    (4) <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The Government

2 must produce this information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request includes any

3 cooperation or attempted cooperation by the defendant as well as any information that could affect any base

4 offense level or specific offense characteristic under Chapter Two of the Guidelines.  The defendant also

5 requests any information relevant to a Chapter Three adjustment, a determination of the defendant's criminal

6 history, and information relevant to any other application of the Guidelines.

7    (5) <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record. Fed. R.

8 Crim. P. 16(a)(1)(B).

9    (6) <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts

10 under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, under Rule 404(b), "upon

11 request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

12 general nature . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(B) at trial.

13 The defendant requests that such notice be given three (3) weeks before trial in order to give the defense time

14 to adequately investigate and prepare for trial.

15    (7) <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any search,

16 either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(C).

17    (8) <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the preservation of

18 all dispatch tapes or any other physical evidence that may be destroyed, lost, or otherwise put out of the

19 possession, custody, or care of the Government and which relate to the arrest or the events leading to the arrest

20 in this case.

21    (9) <u>Tangible Objects</u>.  The defendant requests the opportunity to inspect and copy as well as test,

22 if necessary, all other documents and tangible objects, including photographs, books, papers, documents,

23 fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or intended for

24 use in the Government's case-in-chief or were obtained from or belong to the defendant.  Fed. R. Crim. P.

25 16(a)(2)(c).

26    (10) <u>Evidence of Bias or Motive to Lie</u>.  The defendant requests any evidence that any prospective

27 Government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

28 her testimony.

(11) <u>Impeachment Evidence</u>. The defendant requests any evidence that any prospective Government witness has engaged in any criminal act whether or not resulting in a conviction and whether any witness has made a statement favorable to the defendant. <u>See</u> Fed. R. Evid. 608, 609 and 613; <u>Brady v. Maryland</u>, <u>supra</u>.

(12) <u>Evidence of Criminal Investigation of Any Government Witness</u>. The defendant requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

(13) <u>Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling</u>. The defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic.

(14) <u>Witness Addresses</u>. The defendant requests the name and last known address of each prospective Government witness. The defendant also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will <u>not</u> be called as a Government witness.

(15) <u>Name of Witnesses Favorable to the Defendant</u>. The defendant requests the name of any witness who made an arguably favorable statement concerning the defendant or who could not identify him or who was unsure of his identity, or participation in the crime charged.

(16) <u>Statements Relevant to the Defense</u>. The defendant requests disclosure of any statement relevant to any possible defense or contention that he might assert.

(17) <u>Jencks Act Material</u>. The defendant requests production in advance of trial of all material, including dispatch tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at the request of defendant to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under § 3500(e)(1). <u>Campbell v. United States</u>, 373 U.S. 487, 490-92 (1963). In <u>United States v. Boshell</u>, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

08CR0091-L

(18)  Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant requests all statements and/or promises, express or implied, made to any Government witnesses, in exchange for their testimony in this case, and all other information which could arguably be used for the impeachment of any Government witnesses.

(19)  Agreements Between the Government and Witnesses.  The defendant requests discovery regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future compensation, or any other kind of agreement or understanding, including any implicit understanding relating to criminal or civil income tax, forfeiture or fine liability,  between any prospective Government witness and the Government (federal, state and/or local).  This request also includes any discussion with a potential witness about or advice concerning any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not followed.

(20)  Informants and Cooperating Witnesses.  The defendant requests disclosure of the names and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime charged against Mr. Navarro-Lomeli.  The Government must disclose the informant's identity and location, as well as disclose the existence of any other percipient witness unknown or unknowable to the defense. Roviaro v. United States, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information derived from informants which exculpates or tends to exculpate the defendant.

(21)  Bias by Informants or Cooperating Witnesses.  The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States, 405 U.S. 150 (1972).  Such information would include what, if any, inducements, favors, payments or threats were made to the witness to secure cooperation with the authorities.

(22) Government Examination of Law Enforcement Personnel Files.  Mr. Navarro-Lomeli requests that the Government examine the personnel files and any other files within its custody, care or control, or which could be obtained by the government, for all testifying witnesses, including testifying officers. Mr. Navarro-Lomeli requests that these files be reviewed by the Government attorney for evidence of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any information that is exculpatory, pursuant to its duty under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  The

1  obligation to examine files arises by virtue of the defense making a demand for their review: the Ninth Circuit

2  in Henthorn remanded for in camera review of the agents' files because the government failed to examine the

3  files of agents who testified at trial.  This Court should therefore order the Government to review all such files

4  for all testifying witnesses and turn over any material relevant to impeachment or that is exculpatory to

5  Mr. Navarro-Lomeli prior to trial.  Mr. Navarro-Lomeli specifically requests that the prosecutor, not the law

6  enforcement officers, review the files in this case.  The duty to review the files, under Henthorn, should be

7  the prosecutor's.  Only the prosecutor has the legal knowledge and ethical obligations to fully comply with

8  this request.

9      (23)  Expert Summaries.  Defendant requests written summaries of all expert testimony that the

10  government intends to present under Federal Rules of Evidence 702, 703 or 705 during its case in chief,

11  written summaries of the bases for each expert's opinion, and written summaries of the experts' qualifications.

12  Fed. R. Crim. P. 16(a)(1)(E).  This request includes, but is not limited to, fingerprint expert testimony.

13      (24)  Residual Request.  Mr. Navarro-Lomeli intends by this discovery motion to invoke his rights

14  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

15  and laws of the United States.  This request specifically includes all subsections of Rule 16.  Mr. Navarro-

16  Lomeli requests that the Government provide him and his attorney with the above requested material

17  sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

18  **III.**

19  **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'
INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN
20  AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE
FIFTH AMENDMENT BY DEPRIVING MR. NAVARRO-LOMELI OF THE
21  TRADITIONAL FUNCTIONING OF THE GRAND JURY**

22  **A.    Introduction.**

23      The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was

24  instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See

25  Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto

26  as Exhibit A.  Judge Burns' instructions to the impaneled grand jury deviate from the instructions at issue in

27  the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in

28  //

6                                          08CR0091-L

1  several ways.[1]  These instructions compounded Judge Burns' erroneous instructions and comments to

2  prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions

3  at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto

4  as Exhibit B.[2]

5          **1.      Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine**
           **Whether or Not Probable Cause Exists and That They Have No Right to Decline to**
6          **Indict When the Probable Cause Standard Is Satisfied.**

7          After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

8  responsibility, see Ex. A at 3, 3-4, 5, Judge Burns instructed the grand jurors that they were forbidden "from

9  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

10  federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

11  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

12  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

13  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

14  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

15  because the grand jurors disagree with a proposed prosecution.

16          Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

17  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

18          I've gone over this with a couple of people.  You understood from the questions and
           answers that a couple of people were excused, I think three in this case, because they could
19          not adhere to the principle that I'm about to tell you.

20  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

21  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

22  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

23  _____

24  [1]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas,
     408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v.
25  Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156
26  (9th Cir. 2002) (per curiam).

27  [2]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the
     grand jury.  Mr. Navarro-Lomeli requests that the video presentation be produced.  See United States v. Alter,
28  482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground
     rules by which the grand jury conducts those proceedings are not.").

Examination of the voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns' emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context which makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Navarro-Lomeli will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service. See id. at 16-17. Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that he would not want him or her to decline to

1  indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17,

2  but in which there was probable cause. See Id. Such a case "should go forward." See id. Any grand juror

3  listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

4  them to vote "no bill" in the face of a showing of probable cause.

5        Just in case there may have been a grand juror that did not understand his or her inability to exercise

6  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

7  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

8  "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

9  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

10 considerations into account. Id. at 24-25. Having stated that REA was to "abide" by the instruction given to

11 trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases.

12 See id. at 25.

13       In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

14 That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

15 juror is obligated to vote to indict if there is probable cause. See id. at 26-27. Thus, the grand juror's duty is

16 to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an

17 "obligation" to indict.

18       Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

19 paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

20 to indict in every case in which there was probable cause. See id. at 27. Two aspects of this exchange are

21 crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether

22 he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the

23 case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all)

24 cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views. The

25 message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once

26 the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward." See id. at 27.

27 That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

28 //

08CR0091-L

1
        **2.     The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

2

3
        In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

4
grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex.

5
A at 20.[3]

6
        The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that

7
"the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8
gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something

9
adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that." See id.  Thus,

10
Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

11
"adverse" or "that cuts against the charge." See id.

12
**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

13

14
        The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15
grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.  While the Ninth

16
Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17
//

18
//

19
―――――――――――――――

20
[3]  These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S.

21
Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27; see also Ex. B at 38; id. at 43; id. at 40 ("You were saying

22
that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence

23
doesn't substantiate the charges against.").

24
      In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there

25
is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction,

26
which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand

27
jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they

28
understood the instruction as given and then followed it.").

approach[4] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases.  The district court's instructions cannot be reconciled with the role of the grand jury as set forth in <u>Navarro-Vargas II</u>.  Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in <u>Navarro-Vargas</u>, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  <u>See United States v. Williams</u>, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the <u>Navarro-Vargas II</u> majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'"  <u>Navarro-Vargas II</u>, 408 F.3d at 1200 (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 510 (1978)).  <u>Accord</u> <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ).  <u>See also</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, <u>id.</u>, but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  <u>Id.</u>  <u>See</u> Niki Kuckes, <u>The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury</u>, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal Procedure</u> § 15.2(g) (2d ed. 1999)).

Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See</u> <u>id.</u>

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis

---

[4]<u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  of the same facts.  And, significantly, the grand jury may refuse to return an indictment
2  even "'where a conviction can be obtained.'"

3  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of
4  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls
5  not only the initial decision to indict, but also significant questions such as how many counts to charge and
6  whether to charge a greater or lesser offense, including the important decision whether to charge a capital
7  crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II
8  majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse
9  to indict someone even when the prosecutor has established probable cause that this individual has committed
10  a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,
11  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,
12  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.
13  But not in Judge Burns' instructions.

14  **C.     Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established
15            in Both *Vasquez* and *Navarro-Vargas II*.**

16        The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand
17  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision
18  in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every
19  finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at
20  1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably
21  pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of
22  the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors,
23  and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word' should is
24  used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide 1579
25  (1999) (brackets in original)).

26        The debate about what the word "should" means is irrelevant here; the instructions here make no
27  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not
28  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

1  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

2  indicting even though I think that the evidence is sufficient'. . . ."  See Ex. A at 8-9.  Thus, the instruction flatly

3  bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No grand juror

4  would read this language as instructing, or even allowing, him or her to assess "the need to indict."  Vasquez,

5  474 U.S. at 264.

6          While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

7  an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that he could only

8  mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

9  only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

10 probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would

11 strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

12 jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was

13 not.

14         By the same token, if Judge Burns said that "the case should move forward" if there is probable

15 cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

16 Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

17 two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

18 been his intent.  But even if it were, no grand jury could ever have had that understanding.[5]  Jurors are not

19 presumed to be capable of sorting through internally contradictory instructions.  See generally United States

20 v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

21 presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

22         Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

23 clear to the grand jurors that "should" was not merely suggestive, but obligatory:

24 //

25 //

26 _____

27 [5]  This argument does not turn on Mr. Navarro-Lomeli's view that the Navarro-Vargas/Marcucci reading of
the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which
28 the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-
Vargas/Marcucci reading as a possibility.

1    **(1)**    The first occasion occurred in an exchange when Judge Burns conducted voir dire and

2    excused a potential juror (CSW).  See Ex. B at 17.

3    **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that there

4    is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.  See

5    id. at 26-27.  After telling this potential juror (REA) what his obligations and prerogatives were, the Court

6    inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there

7    was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would

8    depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary

9    to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative

10    to do anything other than indict if there is probable cause.

11    **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the point

12    home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

13    on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

14    here."  See id. at 61.

15    **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

16    every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

17    reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

18    that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

19    the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

20    Moreover, Judge Burns advised the grand jurors that they were forbidden from considering the

21    penalties to which indicted persons may be subject.  See Ex. B at 24-25.  A "business-like decision of whether

22    there was a probable cause" would obviously leave no role for the consideration of penalty information.  See

23    id.

24    The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

25    penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

26    United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

27    reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

28    as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

1  ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized

2  consideration of penalty information. See 474 U.S. at 263.

3         Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

4  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

5  was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct

6  contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand

7  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

8  Vasquez:

9       The grand jury does not determine only that probable cause exists to believe that a
     defendant committed a crime, or that it does not. In the hands of the grand jury lies the

10       power to charge a greater offense or a lesser offense; numerous counts or a single count;
     and perhaps most significant of all, a capital offense or a non-capital offense – all on the

11       basis of the same facts.
     Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be

12       obtained."

13  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly, J.,

14  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

15  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

16  charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor

17  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

18  id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent

19  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

20  jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must

21  therefore be dismissed. Id.

22         The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the

23  instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

24  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions."

25  408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may have on a grand

26  jury because "it is the structure of the grand jury process and its function that make it independent." Id. at

27  1202 (emphases in the original).

28  //

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination . . . unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Mr. Navarro-Lomeli understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle . . . ." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on //

1  their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

2  here, Judge Burns has both fashioned his own rules and enforced them.

3  **D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

4

5      In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

6  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

7  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

8  common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

9  judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority

10 "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

11 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

12 Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does

13 not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47

14 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative,

15 rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's claim, both

16 as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

17     Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

18 present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20. Moreover, the district

19 court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can

20 expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

21 act in good faith in all matters presented to you." <u>See id.</u> at 27. The Ninth Circuit has already concluded it

22 is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

23     This particular instruction has a devastating effect on the grand jury's protective powers, particularly

24 if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

25 conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again,

26 the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

27 probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

28 would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they

1  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

2  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

3  cause, but, if none is presented by the government, they can  presume that there is none.  See Ex. B at 14-15

4  ("my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts

5  against the charge, you'll be informed of that.  *They have a duty to do that*.") (emphasis added).

6          These instructions create a presumption that, in cases where the prosecutor does not present

7  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

8  exculpatory evidence was presented, would proceed along these lines:

9          (1)    I have to consider evidence that undercuts probable cause.

10         (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such

11  evidence to me, if it existed.

12         (3)    Because no such evidence was presented to me, I may conclude that there is none.

13  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

14  presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

15  prosecutor would have presented it.

16         The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

17  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

18  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

19  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

20  the Fifth Amendment.

21                                          **IV.**

22  **THE COURT MUST SUPPRESS MR. NAVARRO-LOMELI'S STATEMENTS UNDER THE**
    **FIFTH AMENDMENT**

23

24  **A.    *Miranda* Warnings Must Precede Custodial Interrogation.**

25         The Supreme Court has held that the government may <u>not</u> use statements, whether exculpatory or

26  inculpatory, obtained during custodial interrogation of the defendant unless it demonstrates the use of

27  procedural safeguards effective to secure the privilege against self-incrimination.  Miranda v. Arizona, 384

28  U.S. 436, 444 (1966).  The law imposes no substantive duty upon the accused to make any showing other than

that the statements were taken while the accused was in custody and subject to interrogation.  Id. at 476.
Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into
custody or otherwise deprived of her freedom of action in any significant way.  Id. at 477; see also Orozco
v. Texas, 394 U.S. 324, 327 (1969).  In Stansbury v. California, 511 U.S. 318 (1994), the Supreme Court
stated that "the initial determination of custody depends on the objective circumstances of the interrogation,
not on the subjective views harbored by either the interrogating officers or the person being questioned."  Id.
at 323.

When it takes an accused's statement during custodial interrogation, a heavy burden rests on the
government to demonstrate that the accused intelligently and voluntarily waived her privilege against self-
incrimination.  To satisfy this burden, the prosecution must introduce evidence sufficient to establish "that
under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned
and the consequences of the decision to abandon it."  United States v. Garibay, 143 F.3d 534, 536 (9th Cir.
1998) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). The Ninth Circuit has stated that "[t]here is a
presumption against waiver."  Garibay, 143 F.3d at 536.  The standard of proof for a waiver of constitutional
rights is high.  Miranda, 384 U.S. at 475; see also United States v. Heldt, 745 F.2d 1275, 1277 (9th Cir. 1984)
(the burden on the government is great, the court must indulge every reasonable presumption against waiver
of fundamental constitutional rights) (citing Johnson v. Zerbst, 304 US 458, 464 (1938)).  Finally, it should
be noted that, since Miranda rests on a constitutional foundation, see Dickerson v. United States, 530 U.S.
428, 438 (2000), no law or local court rule relieves the government of its burden to prove that Mr. Navarro
voluntarily waived the Miranda protections.  Miranda, 384 U.S. at 475.

The validity of the waiver depends upon the particular facts and circumstances of the case, and
include the background, experience, and conduct of the accused.  Edwards v. Arizona, 451 U.S. 477, 482
(1981); Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see also Garibay, 143 F.3d at 536; United  States v.
Bernard S., 795 F.2d at 751 ("a valid waiver of Miranda rights depends upon the totality of the circumstances,
including the background, experience and conduct of the accused").  In Derrick v. Peterson, 924 F.2d 813 (9th
Cir. 1990), the Ninth Circuit confirmed that the issue of the validity of a Miranda waiver requires a two prong
analysis: the waiver must be both (1) voluntary; and, (2) knowing and intelligent.  Id. at 820.  The
voluntariness prong of this analysis "is equivalent to the voluntariness inquiry [under] the [Fifth] Amendment

1 . . . ." Id. The knowledge prong mandates an inquiry into whether "the waiver [was] made with a full

2 awareness both of the nature of the right being abandoned and the consequences of the decision to abandon

3 it." Id. (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)); accord Garibay, 143 F.3d at 436. Thus,

4 "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice

5 and the requisite level of comprehension may a court properly conclude that the Miranda rights have been

6 waived." Derrick at 820 (quoting Moran v. Burbine, 475 U.S. at 521) (emphasis in original) (citations

7 omitted)).

8          Here, Mr. Navarro was in custody upon being escorted to the secondary inspection area. Unless and

9 until it shows the agents properly administered the Miranda warnings and obtained a knowing and intelligent

10 waiver from Mr. Navarro, the government cannot use evidence obtained as a result of any custodial

11 interrogation that occurred after Mr. Navarro's arrest. Miranda, 384 U.S. at 479.

12 **B.      The Government Bears the Burden of Proving that Mr. Navarro's Alleged Statements**
13 **Were Made Voluntarily**

14          Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case

15 is deprived of due process of law if her conviction is founded upon an involuntary confession. Arizona v.

16 Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the

17 burden of proving that a confession is voluntary. Lego v. Twomey, 404 U.S. 477, 483 (1972).

18          In order to be voluntary, a statement must be the product of a rational intellect and free will.

19 Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne

20 in a particular case, this Court must consider the totality of the circumstances. Schneckloth at 226; see also

21 United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993). A statement is involuntary if it is

22 "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight,

23 [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v.

24 United States, 168 U.S. 532, 542-43 (1897)); see also United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir.

25 1981).

26          To meet its burden, the government must demonstrate that Mr. Navarro's statement was not the result

27 of either threats or promises made by the agents, but was made voluntarily.

28

**C.    This Court Must Conduct An Evidentiary Hearing.**

Accordingly, this Court must conduct an evidentiary hearing to determine whether the government can meet this burden and use Mr. Navarro's statements against him.  18 U.S.C. § 3501.  Since "'suppression hearings are often as important as the trial itself,'" these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  See United States v. Prieto-Villa, 910 F.2d 601, 609-10 (9th Cir. 1990) (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).

Mr. Navarro's statements were made as a result of the coercive tactics employed by the agents.  Unless and until the government demonstrates that these statements were made voluntarily, the statements may not be used for any purpose at trial.

V.

***APPRENDI V. NEW JERSEY* REQUIRES THAT THIS COURT DISMISS THE INDICTMENT BECAUSE 21 U.S.C. §§ 952 AND 960 ARE UNCONSTITUTIONAL**

When it enacted 21 U.S.C. §§ 952 and 960 congress plainly intended the facts which determine the maximum sentence, drug type and quantity, to be sentencing factors, not elements.  See, e.g., United States v. Sanchez, 269 F.3d 1250, 1268 (11th Cir. 2001) (en banc).  Because that allocation conflicts with the requirements of the Fifth and Sixth Amendments as set forth in Apprendi v. New Jersey, 530 U.S. 466 (2000), the statutes are unconstitutional.  Moreover, because courts cannot disturb Congress's choice of fact-finder, see United States v. Jackson, 390 U.S. 570, 576 (1968) (courts  cannot "return to the [jury] the ultimate duty that Congress deliberately placed in other hands"), the statutes cannot be saved.[6]

As such, these statutes are facially unconstitutional and the Court must dismiss the indictment.

*//*

---

[6]In United States v. Buckland, 289 F.3d 558 (9th Cir. 2002) (en banc) (holding 21 U.S.C. §841 constitutional), and United States v. Mendoza-Paz, 286 F.3d 1104 (9th Cir. 2002) (holding 21 U.S.C. §960 constitutional), the Ninth Circuit rejected a similar constitutional challenge by concluding that §§841 and 960 are sufficiently ambiguous to permit application of the doctrine of constitutional doubt.  See Buckland, 289 F.3d at 564-68; Mendoza-Paz, 286 F.3d at 1109-10.  However, the Supreme Court's subsequent opinion in United States v. Harris, 122 S. Ct. 2406 (2002), indicates that the Ninth Circuit's opinions in both Buckland and Mendoza-Paz were wrongly analyzed and decided.  "It is already well established that where a Supreme Court decision has effectively undermined prior Ninth Circuit precedent, [this Court is] free to reexamine those earlier cases to determine their continuing validity."  United States v. Maybusher, 735 F.2d 366, 371 n.1 (9th Cir. 1984) (9th Cir. 1984) (citation and quotation omitted).

# VI.

## REQUEST FOR LEAVE TO FILE FURTHER MOTIONS

Mr. Navarro-Lomeli and defense counsel have not received all the discovery in this case. As new information comes to light, the defense may find it necessary to file further motions. Therefore, defense counsel requests the opportunity to file further motions based upon information gained from any further discovery.

# VII.

## CONCLUSION

For the reasons stated above, Mr. Navarro-Lomeli respectfully requests that this Court grant the foregoing motions.

Respectfully submitted,


DATED: January 22, 2008                    */s/ Robert R. Henssler*
                                           ROBERT R. HENSSLER JR
                                           Federal Defenders of San Diego, Inc.
                                           Attorneys for Mr. Navarro-Lomeli